NOT YET SCHEDULED FOR ORAL ARGUMENT

# United States Court of Appeals for the District of Columbia Circuit

**Nos. 26-7008**

(Consolidated with 26-7009)

CHRISTOPHER CHANDLER,

*Plaintiff-Appellee,*

*v.*

DONALD BERLIN,

*Defendant-Appellant,*

INVESTIGATIVE CONSULTANTS, INC.,

*Defendant-Appellant.*

*On Appeal from the United States District Court for the District of Columbia in No. 1:18-cv-02136-APM, Amit Priyavadan Mehta, U.S. District Judge*

# REPLY BRIEF FOR DEFENDANTS-APPELLANTS


Christopher L. Rogan
ROGAN MILLER ZIMMERMAN, PLLC
50 Catoctin Circle NE, Suite 300
Leesburg, VA 20176
crogan@rmzlawfirm.com

*Counsel for Defendant-Appellant Donald Berlin in 26-7009*

JAMES P. CAMPBELL
MATTHEW L. CLARK
DANIEL M. CASTO
CAMPBELL CASTO CLARK, PC
1602 Village Market Boulevard SE, Suite 225
Leesburg, Virginia 20175
(703) 771-8344
jcampbell@campbellcastoclark.com
mclark@campbellcastoclark.com
dcasto@campbellcastoclark.com

*Counsel for Defendant-Appellant Investigative Consultants, Inc. in 26-7008*


July 20, 2026

CP COUNSEL PRESS (800) 4-APPEAL • (815728)

## TABLE OF CONTENTS

**Page**


TABLE OF AUTHORITIES .......... iii

GLOSSARY .......... vi

SUMMARY OF THE ARGUMENT .......... 1

ARGUMENT .......... 4

A. Mr. Chandler's theory confirms that the jury verdict rests on unrecoverable 2017-publication harm and speculation, and not competent evidence of injury caused by the 2003 Report .......... 4

1. Mr. Chandler cannot avoid this Court's mandate by re-labeling 2018 distress as 2003-publication damages .......... 4

2. Mr. Chandler's 2004 law-enforcement encounters do not supply competent causation evidence .......... 7

3. Mr. Chandler's "belief" and "distribution" arguments do not bridge the evidentiary gap .......... 8

4. Mr. Chandler's presumed-damages argument would make excessiveness review meaningless .......... 9

a. *Gertz* did not constitutionalize limitless presumed damages .......... 10

b. D.C. law permits review of presumed-damages awards for reasonableness and evidentiary support .......... 13

c. The cases Mr. Chandler invokes do not justify this award .......... 16

5. Mr. Chandler's punitive-damages defense is derivative and fails with the compensatory award .......... 20

B. The District Court's limitations instruction omitted the controlling accrual test and prejudiced the Appellants .......... 21

1. The issue was preserved .......... 21

2. The District Court's instructions did not fairly present *Diamond* or this Court's remand mandate from *Chandler I* .....23

3. The error was prejudicial .....26

CONCLUSION .....28

## TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*AF Holdings, LLC v. Doe*,
752 F.3d 990 (D.C. Cir. 2014) ........ 15

*Afro-Am. Publ'g Co. v. Jaffe*,
366 F.2d 649 (D.C. Cir. 1966) ........ 10, 13, 15

*Airlie Found., Inc. v. Evening Star Newspaper Co.*,
337 F. Supp. 421 (D.D.C. 1972) ........ 9, 14

*Anagnost v. Mortg. Specialists, Inc.*,
No. 2015-CV-00175, 2017 WL 7690898 (N.H. Super. Ct. Sept. 29, 2017) ........ 18

*Cantu v. Flanigan*,
705 F. Supp. 2d 220 (E.D.N.Y. 2010) ........ 17, 18

*Carey v. Piphus*,
435 U.S. 247 (1978) ........ 11, 12

*Carter v. Duncan-Huggins, Ltd.*,
727 F.2d 1225 (D.C. Cir. 1984) ........ 7

*Chandler v. Berlin*,
998 F.3d 965 (D.C. Cir. 2021) ........ 1, 2, 3, 4, 5, 6,
........ 15, 16, 19, 23, 24, 25, 26, 27, 28

*Coleman v. Southwick*,
9 Johns. 45 (N.Y. Sup. Ct. Jud. 1812) ........ 3, 13

*Diamond v. Davis*,
680 A.2d 364 (D.C. 1996) ........ 1, 3, 4, 21, 23, 24, 25, 26, 27, 28

*Dun & Bradstreet v. Greenmoss Builders*,
472 U.S. 749 (1985) ........ 10

*Freeman v. Giuliani*,
732 F. Supp. 3d 30 (D.D.C. 2024) ........ 16

*Gasperini v. Ctr. for Humanities*,
518 U.S. 415 (1996) ........ 13

*Gertz v. Robert Welch, Inc.*,
418 U.S. 323 (1974) ........ 6, 10, 11, 12, 13

*Grossman v. Goemans*,
631 F. Supp. 972 (D.D.C. 1986)....................................................................10

*Hearts With Haiti, Inc. v. Kendrick*,
141 F. Supp. 3d 99 (D. Me. 2015)..................................................................17

*Ingber v. Ross*,
479 A.2d 1256 (D.C. 1984) .............................................................. 3, 9, 13, 14

*Jeffries v. Potomac Dev. Corp.*,
822 F.2d 87 (D.C. Cir. 1987).............................................................................3

*Koon v. U.S.*,
518 U.S. 81 (1996), *superseded by statute on other grounds* ............................15

*Lafferty v. Jones*,
327 A.3d 941 (Conn. App. Ct. 2024) ................................................................19

*Lewis v. Elliott*,
628 F. Supp. 512 (D.D.C. 1986)........................................................................9

*Long v. Howard Univ.*,
550 F.3d 21 (D.C. Cir. 2008)........................................................................ 21, 23

*Memphis Cmty. Sch. Dist. v. Stachura*,
477 U.S. 299 (1986) .........................................................................................10

*Moss v. Stockard*,
580 A.2d 1011 (D.C. 1990) .............................................................. 3, 10, 13, 14

*Muldrow ex rel. Estate of Muldrow v. Re-Direct, Inc.*,
493 F.3d 160 (D.C. Cir. 2007)..........................................................................23

*Peyton v. DiMario*,
287 F.3d 1121 (D.C. Cir. 2002)........................................................................15

*State Farm Mut. Auto. Ins. Co. v. Campbell*,
538 U.S. 408 (2003) .........................................................................................20

*Szymkowicz v. Frisch*, Civil Action No. 1903329 (BAH), 2020 U.S. Dist. LEXIS
136537 (D.D.C. July 31, 2020) ........................................................................19

*U.S. ex rel. Miller v. Bill Harbert Int'l Constr., Inc.*,
608 F.3d 871 (D.C. Cir. 2010)............................................................................3

*Wynn v. Francis*,
No. B245401, 2014 Cal App. Unpub. LEXIS 4382
(Cal. Ct. App. June 23, 2014)....17

**Statutes & Other Authorities:**

U.S. Const. amend. I....11

42 U.S.C. § 1983....11, 12

2 F. Harper & F. James, *Law of Torts* § 25.1 (1956)....12

Fed. R. Civ. P. 51....21, 22, 23

Fed. R. Civ. P. 51(b)(2)....22

Fed. R. Civ. P. 51(c)(1)....22

Fed. R. Civ. P. 51(c)(2)....22

RESTATEMENT OF TORTS § 621, Comment a (1938)....10

Rule 59....28

## GLOSSARY

**ICI** — Appellants Donald Berlin and Investigative Consultants, Inc., collectively.

**Dossier** or **2003 Report** — the document prepared by ICI and provided to Robert Eringer in 2003.

***Chandler I*** — this Court's prior decision in *Chandler v. Berlin*, 998 F.3d 965 (D.C. Cir. 2021).

## SUMMARY OF THE ARGUMENT

This appeal arises from a jury's verdict of $4,000,000 in compensatory damages, and $4,000,001 in punitive damages for the publication to Mr. Robert Eringer ("Mr. Eringer") of a 134-page report titled the "Richard Chandler Limited Global Scan" (the "2003 Report"). The Appellants, Mr. Donald Berlin ("Mr. Berlin"), and Investigative Consultants, Inc. (collectively, "ICI"), appeal on the grounds it was unreasonable and excessive because it was unsupported by evidence that the Appellee, Mr. Christopher Chandler ("Mr. Chandler"), suffered any actual harm as a result of the initial publication of the 2003 Report. The Appellants further argue that the District Court failed to properly instruct the jury on the accrual of the Statute of Limitations under *Diamond v. Davis*, 680 A.2d 364, 372-381 (D.C. 1996), and this Court's guidance from the prior appeal in *Chandler v. Berlin*, 998 F.3d 965 (D.C. Cir. 2021) ("*Chandler I*").

With respect to the first issue, Mr. Chandler's Brief of Appellee confirms the central problem with the judgment: the $8,000,001 jury verdict rests on damages evidence this Court previously held could not be charged to the Appellants, plus speculation about events unconnected to the 2003 Report.

This Court's prior decision in *Chandler I* drew a clear line: the Appellants could be tried in relation to the publication of the 2003 Report to Mr. Eringer and the foreseeable 2003-era consequences of that publication, but they could not be held

responsible for the republications by the British Press that followed in 2017. *See Chandler I*, 998 F.3d at 977.

Mr. Chandler now tries to evade that line by arguing that emotional distress he experienced in 2018—after British media attention provided an opportunity for him to read the publication in 2018—should be treated as evidence of harm from the 2003 Report. That argument cannot be reconciled with the evidence at trial. The distress Mr. Chandler recounted arose only after the 2017 republications brought the underlying allegations into the public sphere and led him to the 2003 Report. Without those barred republications, the record contains no evidence of any emotional distress, reputational injury, or pecuniary harm from the initial publication of the 2003 Report.

Mr. Chandler cannot properly fill in the missing evidentiary gap with speculation about law-enforcement encounters in France and Monaco. Mr. Chandler admittedly did not know why those encounters occurred. *See* Trial Tr., Day 2 – Afternoon, Direct Examination of Christopher Chandler, at 334:22-23 (Dkt. 243) (JA 2623). He offered no witness from Monaco, France, the CIA, or Prince Albert's circle to connect those encounters to the 2003 Report. The jury could make inferences, but it could not properly build a multimillion-dollar award on conjecture.

Mr. Chandler's presumed-damages argument fares no better. Presumed damages are not a license for a jury to award any amount it chooses. Presumed

damages exist because reputational injury may be difficult to prove. However, this difficulty does not eliminate the requirement that a compensatory award be within a reasonable range and bear some rational relationship to the evidence. *See U.S. ex rel. Miller v. Bill Harbert Int'l Constr., Inc.*, 608 F.3d 871, 905 (D.C. Cir. 2010); *Moss v. Stockard*, 580 A.2d 1011, 1035 (D.C. 1990). D.C. law, federal due process principles, and ordinary excessiveness review all require more than Mr. Chandler presented at trial. *See Ingber v. Ross*, 479 A.2d 1256, 1265 (D.C. 1984) (quoting *Coleman v. Southwick*, 9 Johns. 45, 52 (N.Y. Sup. Ct. Jud. 1812) (Kent, Ch.)); *see also Jeffries v. Potomac Dev. Corp.*, 822 F.2d 87, 95-96 (D.C. Cir. 1987).

Finally, with respect to the second primary issue on appeal, Mr. Chandler's arguments rely on rewriting what *Diamond* and *Chandler I* required. In *Chandler I,* this Court instructed the jury to decide when Mr. Chandler knew or should have known of some injury, its cause-in-fact, and some evidence of wrongdoing distinct from Mr. Eringer's known wrongdoing. *See Chandler I*, 998 F.3d at 975. The District Court did not give that instruction. It instead reduced the inquiry to when Mr. Chandler was on notice that the Appellants authored the report, while telling the jury that the circumstances might be such that no investigation was required at all. *See* Jury Instructions at 11-12 (Dkt. 232) (JA 2137 – JA 2138). That omission mattered. It allowed the jury to excuse Mr. Chandler's years of inaction despite having "some evidence of wrongdoing," without applying the three-part accrual

standard under *Diamond*, as mandated by this Court. These instructions were erroneous and should require that the judgment be vacated.

## ARGUMENT

### *A. Mr. Chandler's theory confirms that the jury verdict rests on unrecoverable 2017-publication harm and speculation, and not competent evidence of injury caused by the 2003 Report.*

Mr. Chandler does not dispute that *Chandler I* bars recovery for harms flowing from the 2017 British-Press republications. Nor could he. This Court explicitly held that the Appellants could not be "held responsible for damage flowing from Mr. Eringer's later republication." *Chandler I*, 998 F.3d at 978. The question is whether Mr. Chandler identified competent evidence of a $4 million compensatory injury caused by the 2003 Report, and foreseeable 2003-era dissemination, as opposed to the later unforeseeable public controversy in 2017. He did not.

Mr. Chandler's damages arguments depend principally on two categories of evidence: (1) Mr. Chandler's testimony about how he felt when he read the 2003 Report ***in 2018***; and (2) his testimony that he experienced suspicious law-enforcement encounters around 2004. Neither category supports this verdict.

#### **1. Mr. Chandler cannot avoid this Court's mandate by re-labeling 2018 distress as 2003-publication damages.**

Mr. Chandler argues that his testimony about how he felt when reading the 2003 Report for the first time in 2018 is somehow not distress caused by the 2017 republications. Neither evidence nor logic supports that argument. Mr. Chandler

read the 2003 Report when he did (in 2018) because the 2017 republications generated public accusations, media coverage, and an interview in which he requested and obtained access to the document. The emotional reaction that Mr. Chandler recounts is inseparable from that later chain of events.

The mandate problem cannot be solved by changing labels. Because the Appellants "cannot be held liable for [Mr.] Eringer's alleged 2017 republication,"[1] and because that 2017 republication led Mr. Chandler to discover and experience distress about the 2003 Report in 2018, Mr. Chandler cannot convert his feelings of distress in 2018 into damages that are recoverable for the original publication simply by saying it was the distress he felt while looking at the original document. Otherwise, *Chandler I*'s limitation would have no practical effect. Every harm from a barred republication could be recast as distress about learning what the original document said. No authority cited by Mr. Chandler supports this novel proposition.

Mr. Chandler's brief underscores this point. It repeatedly emphasizes that Mr. Chandler "finally" read the 2003 Report in 2018 when media outlets were reporting on a 2003 Report. *See* Br. of Appellee at p. 16. This is precisely the 2017-republication pathway this Court excluded as a basis for liability and/or damages. *See Chandler I*, 998 F.3d at 978. The relevant question is not whether Mr. Chandler's reaction was sincere. It is whether the reaction was a compensable consequence of

[1] *Chandler I*, 998 F.3d at 978.

the publication of the Report in 2003, rather than the limit of liability for the Appellants mandated by *Chandler I*. On this record, Mr. Chandler's principal emotional-distress evidence arose from the 2017 chain of events and, therefore, cannot serve as evidence of his actual harm that can sustain the award.

The District Court made the same error. It affirmed the damages award by relying on Mr. Chandler's testimony that reading the 2003 Report *in 2018* was "gutting" and comparable to a mugging. Memorandum Opinion and Order at p. 16 (Dkt. 260) (JA 4323).

However, that testimony concerned the first time Mr. Chandler read the 2003 Report in 2018. It was not evidence that, in 2003, or the years immediately following, Mr. Chandler suffered $4 million in reputational or emotional injury proximately resulting from the limited dissemination to Mr. Eringer, Prince Albert, or CIA personnel.

Mr. Chandler responds that actual injury may include internal emotional harm, not merely out-of-pocket loss. That general proposition is not disputed. *See Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 350 (1974). The problem is causation and recoverability. Emotional distress is compensable only if it is attributable to the actionable publication at issue, not to a later republication this Court has already expressly removed from consideration or recovery. The record does not permit the

multimillion-dollar award to be sustained on Mr. Chandler's attempt to blur this important distinction.

**2. Mr. Chandler's 2004 law-enforcement encounters do not supply competent causation evidence.**

Mr. Chandler next relies on his testimony that around 2004, he experienced unusual law-enforcement or customs encounters in France and Monaco. *See* Br. of Appellee at pp. 18-21. He then suggests that these should be attributed to the 2003 Report. But these arguments depend on pure speculation that cannot support a damages award. *See Carter v. Duncan-Huggins, Ltd.*, 727 F.2d 1225, 1239 (D.C. Cir. 1984) (recognizing that a jury's verdict may not be based on speculation).

Mr. Chandler candidly admitted he did not know why those encounters occurred. *See*, *e.g.*, Trial Tr., Day 2 – Afternoon, Direct Examination of Christopher Chandler, at 334:22-23 (Dkt. 243) (JA 2623). No law-enforcement witness testified. No document connected the encounters to the Appellants, Mr. Eringer, Prince Albert, or the CIA. No official from Monaco, France, or the CIA testified that the 2003 Report was received, believed, transmitted, or acted upon in a way that caused any search, detention, questioning, or reputational consequence. Mr. Chandler's argument is simply that the timing seemed suspicious and that a jury could infer causation.

That inference is too attenuated to sustain a $4 million compensatory damages award. A jury may draw reasonable inferences from proven facts, but it may not stack conjecture upon conjecture.

The fact that the alleged defamatory charges were serious does not cure this evidentiary defect. Serious accusations may increase the potential for harm when harm is shown. Serious accusations do not prove that a particular law-enforcement event occurred because of those accusations.

**3. Mr. Chandler's "belief" and "distribution" arguments do not bridge the evidentiary gap.**

Mr. Chandler next argues that Mr. Eringer, Prince Albert, and CIA officials "could" have believed the accusations, and that dissemination to powerful people was inherently damaging. *See* Br. of Appellee, at pp. 22-23, 24-25.

Again, Mr. Chandler identifies no competent evidence that Prince Albert (1) read the relevant document, (2) believed the accusations, (3) changed his view of Mr. Chandler, or (4) communicated the accusations to others in a way that caused injury. Mr. Chandler also failed to present competent evidence that anyone at the CIA (1) read the document, (2) believed it, (3) acted on it, or (4) communicated the accusations to others in a way that caused injury. Mr. Eringer's alleged belief about the 2003 Report cannot support the verdict of $4 million in compensatory damages where the original publication was to Mr. Eringer himself, and where this Court has excluded the later public republications in 2017 and after.

When evaluating defamation damages awards, D.C. law permits juries to consider the seriousness of the charge, the extent of distribution, the extent to which the communication was believed, and the plaintiff's prominence. *See Ingber*, 479 A.2d at 1265. While those are factors to be considered, they are not substitutes for evidence. They guide a damages assessment when the record supports the assessment; they do not authorize a jury to presume every missing causal link and then assign a multimillion-dollar figure untethered to proof. *See id.* (recognizing that presumed damages are subject to review for excessiveness); *see also Lewis v. Elliott*, 628 F. Supp. 512, 524 (D.D.C. 1986) (conducting a reasonableness review of a defamation award, and concluding that the "jury's damage award exceeded the maximum limit of the reasonable range within which the jury could reasonably operate"); *Airlie Found., Inc. v. Evening Star Newspaper Co.*, 337 F. Supp. 421, 431 (D.D.C. 1972) (conducting a reasonableness review and concluding that "the jury's verdict in this case was excessive under the appropriate standards").

**4. Mr. Chandler's presumed-damages argument would make excessiveness review meaningless.**

Mr. Chandler's brief ultimately retreats to presumed damages. He argues that once actual malice was found, the jury could award substantial sums without proof of actual harm, and that the award may be affirmed on presumed-damages grounds even if his actual-injury evidence is weak, or non-existent. That approach would make excessiveness review illusory.

Presumed damages are not punitive damages by another name. They are a form of compensatory damages. *See Dun & Bradstreet v. Greenmoss Builders*, 472 U.S. 749, 765 (1985) (Burger, J., concurring) (citing RESTATEMENT OF TORTS § 621, Comment a, p. 314 (1938)); *see also Memphis Cmty. Sch. Dist. v. Stachura*, 477 U.S. 299, 310 (1986) (holding that "[p]resumed damages are a substitute for ordinary compensatory damages"). Their function is to address reputational injuries that may be difficult to prove with precision. *Accord Afro-Am. Publ'g Co. v. Jaffe*, 366 F.2d 649, 660 (recognizing that "[t]he law of libel provides redress in general damages for the impact of the libel on reputation, with mental suffering a recognized element of damage recoverable."); *Grossman v. Goemans*, 631 F. Supp. 972, 974 (D.D.C. 1986) (concluding that in a case where presumed damages were available as a result of "serious" false charges that were "published to more than 170 persons," but when the plaintiffs "offered no evidence of any actual damages they suffered as a result of the libel," an award of $2,500 in nominal damages was appropriate). But because they remain compensatory, they must remain reviewable for reasonableness. *See Moss*, 580 A.2d at 1035. Mr. Chandler cannot use "presumed damages" to justify an $8 million judgment supported by an evidentiary vacuum.

**a. *Gertz* did not constitutionalize limitless presumed damages.**

Mr. Chandler next quotes *Gertz v. Robert Welch, Inc.*, 418 U.S. 323 (1974) for the proposition that juries may award substantial sums as presumed damages. Br. of

Appellee, at p. 29. Mr. Chandler also suggests that the Supreme Court in *Gertz* blessed the practice of juries awarding substantial sums "for supposed damage to reputation without any proof that such harm actually occurred." *Id.* (quoting *Gertz*, 418 U.S. at 349). *Gertz*, however, hardly blessed this practice, nor did it embrace it as a virtuous legal doctrine. To the contrary, the Supreme Court made this observation in the context of criticizing the practice as troublesome and unsound, and in announcing that the U.S. Constitution prohibits substantial awards of presumed damage unsupported by evidence of actual injury in the absence of actual malice. *See* 418 U.S. at 349.

The actual-malice requirement in *Gertz* is constitutional. It determines when presumed damages may be available without violating the First Amendment. *Gertz*, 418 U.S. at 349. It does not answer the separate question whether the amount awarded is excessive under D.C. law, federal review standards, or due process. The fact that presumed damages are legally available does not mean this award was legally sustainable when Mr. Chandler failed to present any evidence of actual harm from the initial publication of the 2003 Report.

Nor does Mr. Chandler's citation to *Carey v. Piphus* help his cause. Br. of Appellee at 29. *Carey* is not a defamation case, but rather it addresses whether damages should be presumed for alleged violations of constitutional rights under claims brought under 42 U.S.C. § 1983. 435 U.S. 247, 262 (1978). When analyzing

that question, *Carey* begins by recognizing that "'[t]he cardinal principle of damages in Anglo-American law is that of *compensation* for the injury caused to plaintiff by defendant's breach of duty.'" *Id*. at 254-55 (citing 2 F. Harper & F. James, *Law of Torts* § 25.1, p. 1299 (1956) (emphasis in original)). In the context of declaring that presumed damages do not apply to constitutional claims brought under 42 U.S.C. § 1983, the Supreme Court summarized many of its earlier observations from *Gertz* and the law of defamation generally but did not announce any particular favor for the doctrine of presumed damages. If anything, *Carey*'s concern with proof and compensation reinforces that presumed damages must be tied to the nature of the injury the law presumes, and should not be used as a vehicle for punishment or sympathy. *Id.*

Mr. Chandler also argues that, "[b]ecause actual malice was established at trial, it is unnecessary to determine whether the award reflected actual damages, presumed damages, or some combination of the two." Br. of Appellee at 34. This argument also fails. Even if the verdict was general, it cannot be insulated from review where the only evidence supporting it was legally unrecoverable or speculative. Mr. Chandler's "any theory" argument likewise fails because the presumed-damages theory still must produce a compensatory amount within a reasonable range. A general verdict cannot save an award that is unsupported by a legally permissible evidentiary foundation.

**b. D.C. law permits review of presumed-damages awards for reasonableness and evidentiary support.**

D.C. law gives juries latitude in valuing intangible injuries, but their determinations are subject to a reasonableness review. *Accord Ingber*, 479 A.2d at 1265; *Afro-Am.*, 366 F.2d at 662. A damages award may be set aside when they are "so excessive as to strike mankind, at first blush, as being, beyond all measure, unreasonable and outrageous, and such as manifestly show the jury to have been actuated by passion, partiality, prejudice or corruption," or "flagrantly outrageous and extravagant, or the court cannot undertake to draw the line; for they have no standard by which to ascertain the excess." *Ingber*, 479 A.2d at 1265 (quoting *Coleman*, 9 Johns. at 52 (1812));[2] *see also Moss*, 580 A.2d at 1036.

Mr. Chandler's position would effectively eliminate the standard governing excessiveness of an award for defamation *per se* whenever actual malice is present. Under his theory, the absence of actual harm would not matter because presumed damages are available and the size of the award would not matter simply because reputational harm is difficult to measure. Further, the lack of causation evidence would not matter because harm may be presumed. That is not D.C. law. *See Moss*, 580 A.2d at 1026 (noting that in *Gertz*, the Supreme Court held that "the states could

---

[2] Because this is a diversity tort case, considerations of the excessiveness of the verdict should be governed through the application of D.C. law. *See Gasperini v. Ctr. for Humanities*, 518 U.S. 415, 439 (1996).

no longer impose liability for defamation without some degree of fault on the defendant's part"); *Airlie*, 337 F. Supp. at 431 (holding that, under D.C. law, the purpose of an award of damages for libel is to compensate, not to punish, and that an award of $419,800 in damages based on the plaintiff's claims of actual losses was excessive when the "upper limit" of actual losses were actually $50,000, and requiring the plaintiff to elect between a remittitur of $50,000 or a new trial on damages).

The cases the Appellants cite in their opening brief demonstrate the contrary principle: presumed damages may support vindication, and sometimes more than nominal damages, but courts retain authority to remit or order a new trial when the award is unsupported by the record. *See Ingber*, 479 A.2d at 1265 (recognizing the authority of courts to review a defamation verdict for excessiveness under D.C. law); *Moss*, 580 A.2d at 1035-36 (holding that "when reviewing the grant of a new trial or remittitur because of an excessive verdict, [an appellate court's] role 'is not merely to rubber-stamp the trial court's decision,' as the trial judge has necessarily assumed the jury's fact-finding role," but that an appellate court's "task is to determine 'whether after close scrutiny there is firm support in the record for a finding by the trial judge that the verdict is so inordinately large as obviously to exceed the maximum limit of a reasonable range within which the jury may properly operate, given the respect accorded the judge's unique opportunity to consider the evidence

in the living court-room context'" (internal citations omitted and alterations in brackets) (emphasis added)); *Afro-Am.*, 366 F.2d at 662 (D.C. Cir. 1966) (observing that a trial court "has undoubted power to reduce jury damages through a remittitur").

This authority is especially important here because the emotionally powerful evidence Mr. Chandler presented was all derivative of the 2017 republications which this Court held in *Chandler I* cannot serve as a basis for liability and damages against the Appellants.

The Appellants recognize that they face a high standard of review for the District Court's denial of a new trial or remittitur, and that reversal of such decisions is exceptional. The Appellants, however, respectfully submit that this case provides a rare example of a case in which such reversal is appropriate. The District Court relied on legally barred evidence. The District Court treated 2018 distress as recoverable 2003-publication harm. The damages amount rests on impermissible evidence, and speculation. It therefore exceeds permissible jury inference. Abuse of discretion exists where the court relies on an improper factor or legally erroneous premise. *Accord Peyton v. DiMario*, 287 F.3d 1121, 1126 (D.C. Cir. 2002); *AF Holdings, LLC v. Doe*, 752 F.3d 990, 994 (D.C. Cir. 2014) (citing *Koon v. U.S.*, 518 U.S. 81, 100 (1996), *superseded by statute on other grounds*.

### c. The cases Mr. Chandler invokes do not justify this award.

Mr. Chandler next attempts to support his arguments by citing large defamation verdicts from other jurisdictions and recent high-profile cases. Those authorities are not controlling, do not establish that his award falls within a reasonable D.C. range, and plainly do not stand for the proposition asserted.

Mr. Chandler first cites "*Freeman v. Giuliani*, No. 21-cv-3354 (D.D.C. Dec. 15, 2023) (Dkt. 135)", for the proposition that the U.S. District Court for the District of D.C. upheld an award of $16 million in presumed damages, and $20 million in emotional-distress damages. Br. of Appellee at 28, fn. 4. That case, however, is distinguishable because it does not address presumed damages, but rather reveals that compensatory damages were awarded based on substantial testimony of emotional harm and distress, as well as expert witness testimony. *See Freeman v. Giuliani*, 732 F. Supp.3d 30, 53-55 (D.D.C. 2024). In contrast, while Mr. Chandler presented some testimony of emotional harm, that testimony was all traceable to harm he suffered solely as a consequence of the 2017 republications which this Court excluded for liability or damages in *Chandler I*. Thus, Mr. Chandler presented no evidence that the 2003 publications caused him to suffer any actual injury. The verdict in *Freeman* does not stand for the proposition that awards for millions of dollars in damages can be upheld based on presumed damages that are unsupported by evidence of actual injury.

Next, Mr. Chandler relies on *Hearts With Haiti, Inc. v. Kendrick*, 141 F. Supp. 3d 99, 114-15 (D. Me. 2015) for the proposition that a $5 million defamation award was upheld based on presumed damages alone. In *Kendrick* there was evidence that defamation caused a plaintiff to suffer $3 million in actual losses for the years 2011 through 2013, and that there was evidence from which the jury could determine the plaintiff suffered $2 million in losses for defamation that continued in 2014 and part of 2015. Thus, unlike this case, the $5 million damages award in *Kendrick* was not based on presumed damages alone, but rather evidence of actual injury in the amount of $5 million.

Mr. Chandler next cites *Wynn v. Francis*, No. B245401, 2014 Cal App. Unpub. LEXIS 4382, at *1 (Cal. Ct. App. June 23, 2014) (unpublished) as a putative example of a case in which an award of $17 million was upheld based on presumed damages alone. That case does not support that proposition. The defamatory statements in that case were widely published on Good Morning America and TMZ. Further, *Wynn* does not address an excessive damages challenge, or contentions that the damages awards were unsupported by evidence of actual injury. Instead, that case analyzed the applicability of various privilege defenses. *Id.* at *12-*27. *Wynn* simply does not support Mr. Chandler's contentions.

Next, Mr. Chandler cites *Cantu v. Flanigan*, 705 F. Supp. 2d 220, 226-31 (E.D.N.Y. 2010) as an example of a case that upheld an award of compensatory

damages based on presumed damages. However, the plaintiff in *Cantu* was awarded $38 million in compensatory damages when the evidence supported findings of actual injury in the amount of approximately $45 million. When considering whether an award for non-economic damages (i.e. for pain and suffering) in the amount of $150 million was appropriate, the trial court observed that prior courts applying New York law had upheld non-economic awards that were 6-times an economic damages award. In that case, the ratio was close to 4 to 1. In contrast, this case presents a far different picture inasmuch as Mr. Chandler failed to present any evidence of actual injury or harm suffered as a result of the Appellants' publication of defamatory materials in 2003. Regardless, *Cantu* does not stand for the proposition that presumed damages, alone, supports an award of $150 million in compensatory damages.

Next, Mr. Chandler cites to *Anagnost v. Mortg. Specialists, Inc.*, No. 2015-CV-00175, 2017 WL 7690898 (N.H. Super. Ct. Sept. 29, 2017) as an example of a case in which a verdict of $105 million was upheld based on presumed damages. The verdict form[3], however, does not mention the words "presumed damages." That case, therefore, does not support the proposition claimed by Mr. Chandler.

[3] Available online at https://mediad.publicbroadcasting.net/p/nhpr/files/anagnost_et_al_v._gill_-_jury_verdict.pdf (last accessed June 30, 2026).

Finally, Mr. Chandler cites *Lafferty v. Jones*, 327 A.3d 941 (Conn. App. Ct. 2024) as a purported example of a $965 million verdict being upheld based on presumed damages alone. There, a Connecticut appellate court upheld the verdict on the grounds that the plaintiffs provided testimony that they suffered severe mental anguish and distress and encountered threats and harassment as a result of lies that Alex Jones and his company, Free Speech Systems, repeated about the Sandy Hook Massacre. An expert witness testified that these lies reached an estimated 550 million people between 2012 and 2018. *Id.* at 975. Unlike this case, the substantial verdict in *Jones* was upheld based on evidence of actual harm and injury and did not rest solely on presumed damages.

Based on this Court's determination from *Chandler I*, Mr. Chandler cannot recover damages stemming from the 2017 republications. 998 F.3d at 974, 977. Evidence that recipients believed and acted upon the allegations is nonexistent. There was no evidence of economic loss. Evidence of contemporaneous emotional distress from the 2003 Report was missing. On the record below, $4 million in compensatory damages is not a permissible presumed-damages award. *See Szymkowicz v. Frisch*, Civil Action No. 1903329 (BAH), 2020 U.S. Dist. LEXIS 136537, at *21 (D.D.C. July 31, 2020) (unpublished) (internal citations omitted) (recognizing that presumed damages are not a "blank check," and that a damages

award based on presumed damages must "roughly approximate his actual harms") (collecting cases).

**5. Mr. Chandler's punitive-damages defense is derivative and fails with the compensatory award.**

Mr. Chandler says the Appellants' punitive damages argument is derivative. That is largely correct: if the compensatory award is vacated or remitted, the punitive award must be reduced or vacated as well.

The jury awarded $4,000,001 in punitive damages against the backdrop of a $4,000,000 compensatory award. If the compensatory award rests on unrecoverable harm, speculation, or excessive presumed damages, the punitive award cannot stand. *Accord State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 419 (2003). Punitive damages are assessed in relation to the actual and potential harm properly attributable to a defendant. *Id.* at 422. When the compensatory predicate is invalid, the punitive award must be vacated or retried. *Id.*

Mr. Chandler argues that punitive damages may be available even where only nominal damages are awarded. That general principle does not answer the issue here. The question is not whether some punitive award could ever be imposed. The question is whether this $4,000,001 award can stand when the compensatory award that anchored it is legally defective. It cannot. *See State Farm*, 538 U.S. at 422.

At a minimum, if this Court orders remittitur or a new trial on compensatory damages, it should also vacate the punitive award and require a new punitive-

damages determination or a constitutionally appropriate remittitur tied to the lawful compensatory award.

***B. The District Court's limitations instruction omitted the controlling accrual test and prejudiced the Appellants.***

Mr. Chandler's defense of the statute-of-limitations instruction has three parts: first, he says the issue was not preserved; second that the wording was discretionary; and third that any error was harmless. Each part fails.

**1. The issue was preserved.**

The Appellants preserved this issue by asking the District Court to instruct the jury on the three-part *Diamond* test and by objecting when the District Court refused. *See* Br. of Appellee at 44-45. Mr. Chandler's preservation argument elevates form over substance.

Under Fed. R. Civ. P. 51, objections to jury instructions are preserved if the objections are made "'on the record, stating distinctly the matter objected to and the grounds for the objection' and 'before the instructions . . . are delivered.'" *Long v. Howard Univ.*, 550 F.3d 21, 25 (D.C. Cir. 2008) (quoting Fed. R. Civ. P. 51). The Appellants sufficiently preserved their objections to the District Court's inquiry notice jury instructions. The District Court understood the objections and rejected them. *See* Trial Tr., Day 4 at 706:22-23 (Dkt. 246) (JA2995). The District Court was aware the Appellants requested that the jury be instructed that the limitations period begins when the plaintiff knows or should know of some injury, its cause-in-

fact, and some evidence of wrongdoing. Trial Tr., Day 4 at 705:8-12 (JA 2994). The District Court rejected that formulation. *Id.* at 705:25 (JA 2994). This was sufficient to preserve the issue for appeal. *See* Fed. R. Civ. P. 51.

Mr. Chandler argues that the Appellants' earlier proposed instruction included other language the court was not required to give. But a party does not forfeit a proper legal objection merely because its proposed instruction contained additional material. Rule 51 requires only that the Appellants object "on the record, stating distinctly the matter objected to and the grounds for the objection." Fed. R. Civ. P. 51(c)(1). The Appellants did so, and their objections were timely-made. Fed. R. Civ. P. 51(c)(2).

Nor does Mr. Chandler's reliance on the timing of a later objection change the result. The issue was raised during the charging conference, before the jury deliberated, and the District Court ruled on it. *See* Trial Tr., Day 4 at 705:8-706:23 (Dkt. 246) (JA 2994 – JA 2995); Fed. R. Civ. P. 51(b)(2). Nothing more was required to alert the District Court and preserve the legal issue for appeal.

In addition, even if trial counsel did waive this objection, this issue would still be preserved for review under a plain error analysis. As this Court has held, "[t]o prevail on a plain-error argument, the objecting party must establish four elements: '(1) there must be an error; (2) the error must be plain; (3) the error must affect substantial rights; and (4) the error must seriously affect the fairness, integrity, or

public reputation of judicial proceedings.'" *Long*, 550 F.3d at 25 (quoting *Muldrow ex rel. Estate of Muldrow v. Re-Direct, Inc*., 493 F.3d 160, 169 (D.C. Cir. 2007)). As set forth herein, the District Court's erroneous jury instructions on inquiry notice would be subject to a plain error review because (1) those instructions were erroneous, (2) the error was plain, (3) the error affected substantial rights (i.e. the timeliness of a claim filed approximately 20 years after an underlying incident occurred), and (4) the error seriously affects the fairness, integrity, or public reputation of judicial proceedings. This is because the erroneous instruction allowed Mr. Chandler to pursue his claims approximately 20 years after the underlying events occurred when the applicable statute of limitations requires that claim to be brought within one year of when the plaintiff knew or "should have known" of the triggering event. *Diamond*, 680 A.2d at 379. Because the Appellants adequately preserved these objections under Fed. R. Civ. P. 51, however, the Court need not conduct a plain error analysis.

**2. The District Court's instructions did not fairly present *Diamond* or this Court's remand mandate from *Chandler I.***

The District Court's jury instructions did not merely choose different words to express the same rule. They omitted *Diamond*'s operative elements.

*Diamond* holds that, where the discovery rule applies, the limitations period begins when the plaintiff "knows, or with the exercise of reasonable diligence would have known, of some injury, its cause-in-fact, and some evidence of wrongdoing,

then she is bound to file her cause of action within the applicable limitations period, measured from the date of her acquisition of the actual or imputed knowledge." 680 A.2d at 381. *Chandler I* applied that test to this case and identified the question on remand: when Mr. Chandler knew or should have known of a possible claim against the Appellants, meaning knowledge of injury, cause-in-fact, and wrongdoing distinct from Eringer's known wrongdoing. 998 F.3d at 975 (quoting *Diamond*, 680 A.2d at 381)).

The jury was not so instructed. Instead, it was told to decide whether Mr. Chandler was on inquiry notice that the Appellants were the authors of the 2003 Report before September 14, 2017. *See* Jury Instructions at 11-12 (Dkt. 232) (JA 2137 – JA 2138). That formulation collapsed the *Diamond* inquiry into a single authorship question. It did not invite the jury to determine when the duty to investigate arose. It did not explain that once Mr. Chandler knew or should have known of injury, cause-in-fact, and some evidence of wrongdoing, he was bound to act with reasonable diligence. And it did not adequately distinguish between knowledge of Mr. Eringer's wrongdoing and knowledge sufficient to require investigation into the Appellants.

The omission mattered because the core defense theory was not simply that Mr. Chandler knew the Appellants' identity before September 14, 2017. The theory was that, long before then, he knew of injury, knew Mr. Eringer was disseminating

accusations, knew the accusations had an origin, and had sufficient information to require reasonable investigative steps that would have revealed the Appellant's role in producing the 2003 Report. *Chandler I* made these factual issues for the jury. The District Court's given instructions did not allow the jury to consider or resolve these questions.

Mr. Chandler argues that the instructions "tracked" *Chandler I* because they used phrases like "inquiry notice," "reasonable diligence," and "all relevant facts and circumstances." But reciting general diligence concepts is not the same as instructing the jury on the legal elements that trigger a duty to investigate. The jury needed to know what facts, if known or knowable, started the limitations clock. *Diamond* supplies these elements. The District Court's actual jury instructions did not.

The Trial Court's statement that injury was "self-evident" once Mr. Chandler knew the Appellants authored the report illustrates the problem. *See* Trial Tr., Day 4 at 707:12-14 (Dkt. 246) (JA 2996). If the injury was treated as self-evident only at the point of authorship knowledge, the jury was never required to decide whether earlier known injuries and wrongdoing attributable to Mr. Eringer triggered a duty to investigate that would have revealed authorship. That is contrary to *Chandler I*, which specifically held that the remand inquiry turned on whether reasonable diligence based on facts before Mr. Chandler at an earlier point required steps that

would have revealed the Appellants' role in the 2003 Report. The District Court's instructions effectively precluded the jury from conducting an inquiry notice determination and constitutes prejudicial error.

**3. The error was prejudicial.**

As a last resort, Mr. Chandler argues that any error in the instructions helped the Appellants because the District Court omitted a requirement that the Appellants otherwise would have had to prove. *See* Br. of Appellee at p. 50. That argument misunderstands the prejudice the Appellants suffered as a result of the District Court's erroneous instructions.

The District Court's instructions not only removed an element from the Appellants' burden; they changed the jury's understanding of when a duty to investigate arises. This precluded the jury from making a proper determination regarding inquiry notice. Without the jury's consideration of *Diamond*'s three-part framework, the jury could conclude that, unless Mr. Chandler already had direct and actual notice of the Appellants' identity, the limitations period did not begin. As set forth in *Chandler I* and *Diamond*, that is not the law. *See Chandler I*, 998 F.3d at 975 (quoting *Diamond*, 680 A.2d at 381)). Inquiry notice asks what a reasonably diligent investigation would have revealed after the plaintiff has sufficient knowledge of injury, cause, and wrongdoing to require investigation. *See Diamond*, 680 A.2d at 381; *Chandler I*, 998 F.3d at 972.

The record made this distinction critical. It was undisputed that Mr. Chandler knew of Mr. Eringer's accusations many years before the lawsuit was filed. *See* Trial Tr., Day 2, Direct Examination of Christopher Chandler at 318:14-16. (Dkt. 243) (JA 2607). He knew those accusations were serious and false. *See* Trial Tr., Day 2, Cross Examination of Christopher Chandler at 350:6-8 (Dkt. 243) (JA 2639). Despite knowing these things, Mr. Chandler chose not to pursue them. Under *Diamond* and *Chandler I*, the jury should have been instructed to decide whether, at any point more than one year before suit, those facts triggered a duty of reasonable investigation that would have revealed the Appellants' role in producing and publishing the 2003 Report. The jury instructions given by the District Court instead allowed the jury to focus on whether Mr. Chandler had actual or near-actual knowledge of the Appellants' authorship.

The prejudice is confirmed by the verdict. The jury rejected the statute of limitations defense after receiving an instruction that failed to identify the very accrual/inquiry notice test this Court mandated in *Chandler I*. Had the jury been instructed that the duty to investigate arose once Mr. Chandler knew or should have known of some injury, its cause-in-fact, and some evidence of wrongdoing distinct from Mr. Eringer's known wrongdoing, it could have, and likely would have, found the claim untimely. That is enough to require a new trial on limitations. *See Diamond*, 680 A.2d at 381.

## CONCLUSION

For the reasons set forth herein, and for the reasons stated in Appellants' opening brief, the Court should vacate the judgment, reverse the denial of appellants' Rule 59 motion, order remittitur or a new trial on damages and punitive damages, and, in the alternative, remand for a new trial on the statute-of-limitations issue with proper instructions under *Diamond* and *Chandler I*.

Respectfully submitted,

**DONALD BERLIN** and
**INVESTIGATIVE CONSULTANTS, INC., Appellants**

**By Counsel**

*/s/ James P. Campbell*
James P. Campbell, Esq. (D.C. Cir. Bar No. 66795)
Matthew L. Clark, Esq. (D.C. Cir. Bar No. 66798)
Daniel M. Casto, Esq. (D.C. Cir. Bar No. 66796)
**CAMPBELL CASTO CLARK, P.C.**
1602 Village Market Blvd., SE
Suite 225
Leesburg, Virginia 20175
Telephone: 703-771-8344
Facsimile: 703-771-8345
JCampbell@campbellcastoclark.com
MClark@campbellcastoclark.com
DCasto@campbellcastoclark.com
*Attorneys for Appellant Investigative Consultants, Inc.*

*/s/ Christopher L. Rogan*
Christopher L. Rogan, Esq. (D.C. Cir. Bar No. 66944)
**ROGAN MILLER ZIMMERMAN, PLLC**
50 Catoctin Circle, NE
Suite 300
Leesburg, VA 20176
crogan@rmzlawfirm.com
*Attorney for Appellant Donald Berlin*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of 6,500 words under Fed. R. App. P. Rule 32(a)(7)(B) and the page limitation of 30 pages under Fed. R. App. P. Rule 32(a)(7)(A) because this document contains 6,453 words across 28 pages.

This brief also complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

Dated: July 20, 2026

/s/ James P. Campbell
James P. Campbell

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing was served via ECF upon counsel for the Appellee this 20th day of July, 2026.

/s/ James P. Campbell
James P. Campbell